### Irwin W. Baker v. William Murphy.

1. REAL ESTATE BROKERS—*Interference of Owner with Broker in Negotiating Sale.*—Where the owner of land engages the services of a broker to sell his land, so as to net seventy dollars per acre, and agrees to protect the broker in pricing the land at from seventy-one to seventy-two dollars and fifty cents, and afterward connives with a prospective purchaser with a view of depriving the broker of his commissions, he is liable to the broker for his services, the latter being instrumental in bringing about the sale of the land.

Assumpsit, for broker's commission. Appeal from the Circuit Court of Vermilion County; the Hon. FERDINAND BOOKWALTER, Judge presiding. Heard in this court at the May term, 1902. Affirmed. Opinion filed November 24, 1902.

C. E. RUSSELL and J. H. DYER, attorneys for appellant.

C. M. BRIGGS, attorney for appellee.

MR. JUSTICE HARKER delivered the opinion of the court.

In the month of April, 1901, appellee and appellant, both residents of Hoopeston, Illinois, entered into a contract whereby appellee was to sell appellant's farm of 159 acres, situated near Clarence, in Ford county, Illinois, at $70 per acre net to appellant, it being agreed that appellee should receive as compensation all that he could sell the land for above that price. Appellee showed the farm to different

prospective purchasers and made frequent efforts to sell it, but without avail. On September 24, 1901, appellant told appellee that he had received a letter from Samuel Kelley, a resident of Clarence, inquiring about the land with a view to purchasing. It was then agreed that appellee, who had arranged to show another man the farm on the following day, should see Kelley and sell it to him, if possible. Appellant promised to protect appellee in his commission upon appellee's pricing the land to Kelley at $71 per acre and stated that he did not care if appellee priced it at $72.50, just so he got $70 net. Appellee, after failing to sell the farm to the man he showed it to on the next day, called upon Kelley at Clarence and priced it to him at $72.50 per acre. That was in the forenoon. Kelley expressed the opinion that the price was too high, but requested appellee to call at his office in the afternoon, which appellee did at about three o'clock. In the second interview, Kelley stated that he was willing to pay $70 per acre and wanted to know if it could not be bought for that. Appellee told him it could not. Between four and five o'clock, he returned by train to Hoopeston. Within a few minutes after reaching there, he saw appellant and Kelley in conversation. Kelley had managed to reach Hoopeston, unobserved by appellee, by boarding the train at Clarence from the side opposite the depot and by riding in a different car from that ridden in by appellee. Appellee, surprised to see Kelley, at once accosted the parties and told appellant that he had been to see Kelley about selling the farm and that if appellant sold it to Kelley, he should expect appellant to pay him for his services. Appellant replied that if there was to be any trouble about the matter, he would take the sale of the property out of appellee's hands. Appellant did sell the farm to Kelley for $70 per acre. Soon after, appellee brought suit against appellant and recovered a judgment of $159 and costs.

It is not disputed that when appellant employed appellee to interview Kelley and, if possible, make a sale of the farm to him, that appellant agreed to protect appellee in

pricing the land to Kelley at from $71 to $72.50 per acre. While appellee was in good faith endeavoring to carry out their mutual understanding, the evidence shows that appellant was scheming with Kelley to deprive appellee of compensation. Immediately after appellee priced the land to Kelley at Clarence and assured him that it could not be purchased at $70 per acre, Kelley called up appellant by telephone and agreed to take the land at $70 per acre. He arranged to have a meeting with appellant that day without the knowledge of appellee, managed to elude appellee in going from Clarence to Hoopeston and agreed upon the terms of sale upon the basis of $70 per acre. The moving influence of each in their reprehensible conduct is apparent. Kelley wanted the land for a price exclusive of appellee's commission. Appellant was anxious for a quick sale. Appellant bargained with Kelley, regardless of his promise to protect appellee in his commission. There can be no misunderstanding as to the proper interpretation and spirit of the expression, " protect him in his commissions." It precluded any interference by appellant until appellee had exhausted reasonable effort to sell to Kelley or until after appellant had in good faith taken the sale of the farm out of appellee's hands. Appellee had not exhausted all reasonable effort to sell to Kelley and appellant did not in good faith take the sale of the land out of appellee's hands. He did announce that he took the sale out of appellee's hands, but that was not until after he had agreed to sell to Kelley at $70 per acre.

Appellee was instrumental in bringing about the sale of the land to Kelley. In doing so, he acted in obedience to the instructions from appellant. Appellant violated his agreement, and to allow him to escape liability now, would be placing a premium upon dishonesty. In this view of the case, it is unnecessary to enter upon a discussion of the instructions. The jury were instructed correctly as we see the case. Justice has been attained and the judgment will be affirmed.